FILED
CLERK, U.S. DISTRICT COURT

SEP 1 2 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                                      DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| May-Loo Music, Inc., et al., | ) | SA CV 03-00943 JVS(SHx) |
| | ) | |
| | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| Plaintiff(s), | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Don Great, et al., | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant(s). | ) | |
| | ) | |

1

```
 1
 2                    FINDINGS OF FACT AND CONCLUSIONS OF LAW
 3
 4          THE COURT:   Okay, it's been a long day, but I said
 5     I would attempt to rule at the end of evidence, and I will
 6     attempt to do so.
 7          I think we necessarily begin with the jury's
 8     verdict because the facts found and the claims found by the
 9     jury I think necessarily provide a context and affect the
10     equitable analysis.   The jury returned a special verdict on
11     plaintiff's special verdict form finding in Question No. 2
12     and Question No. 3 that Great had breached his fiduciary
13     duty and thereby caused harm to Irma Loose and MLM.
14          In Question No. 5, the jury found that what the
15     parties have called here the administration agreement in
16     Exhibits 1 and 701 did not constitute a contract.   In
17     essence, the jury found the agreement void.
18          In Questions 9 through 17, the jury found for MLM
19     and Irma Loose on the fraud claims.   The significance is the
20     jury adjudicated the fact that Mr. Great had committed
21     wrongful conduct.   I think that is a very important factor
22     to carry forward into the equitable analysis.
23          On the defendant's and counterclaimant's special
24     verdict in Questions 1 and 2, the jury found that MLM and
25     Ms. Loose had made no breach of warranty with respect to the
```

1   warranties in the administrative agreement.  In Questions 10

2   and 11, they found that Ms. Loose and MLM had made no

3   misrepresentations.  Basically, the jury found that whatever

4   contractual obligations MLM and Ms. Loose had, they weren't

5   violated.  They also found that there was no fraud on the

6   part of MLM/Ms. Loose.

7        We begin with the fact that the contract is void.

8   Corbin in the case law suggests that to the extent that the

9   parties can do so, notwithstanding the fact that the

10  contract is void, the Court ought to track the parties'

11  expectations and conduct and to the extent possible give

12  credence and carry those provisions out.

13       I cannot do that here because I believe that to do

14  so would ignore the fact that the jury found that Don Great

15  engaged in fraud and breach of fiduciary duty.

16  Nevertheless, Don Great rendered a performance, that is, in

17  administering the contract and in refurbishing the tapes and

18  carrying out other activities.

19       For the purpose of equitable analysis, I believe

20  that unjust enrichment is the correct analysis to see what

21  compensation, if any, Mr. Great should receive for his work.

22  Generally, the performance for which restitution or unjust

23  enrichment is sought has to be one that was performed by

24  mistake or fraud.  I cannot say that Mr. Great's performance

25  was entirely the result of mistake given the jury's fraud

SHARON SEFFENS, U.S. COURT REPORTER

1    finding.  I still believe that he is entitled to

2    restitution/recovery of unjust enrichment on broad equitable

3    principles that are somewhat broader than simply making the

4    mistake because I believe he contributed to the mistake in

5    the form of the jury's finding that there was no contract.

6            The California cases equate unjust enrichment and

7    restitution.  Restitution is the remedy for unjust

8    enrichment.  Let me just briefly quote from the cases

9    beginning with Dunkin, D-u-n-k-i-n, v. Boskey, B-o-s-k-e-y,

10   82 Cal. App. 4th at 171 (2000).  The Court makes a number of

11   observations that are relevant to the analysis that I will

12   adopt and consider in the specific facts of this case.

13           At 195 the Court says:  "An individual is required

14   to make restitution if he or she is unjustly enriched at the

15   expense of another.  A person is enriched if the person

16   receives a benefit at another's expense."

17           At 198, the Court observes:  "We add that the

18   measure of damages to which appellant is entitled for unjust

19   enrichment is synonymous with restitution.  Restitution is

20   defined as restoration of the status quo by awarding an

21   amount which would put plaintiff in as good a position as he

22   would have been if no contract had been made and restores to

23   the plaintiff the value of what he parted with in performing

24   the contract."

25           The Court continues a little bit further on on

1    page 198:  "Ordinarily the benefit to the one and the loss

2    to the other are coextensive.  The result is to compel the

3    one to surrender the benefit which he has received and

4    thereby to make restitution to the other for the loss which

5    he has suffered."  Then after some citations the Court goes

6    on -- and this is I think the key point -- "Equitable

7    considerations govern the award of unjust enrichment

8    however."

9            Most of the cases where the benefit conferred

10   mirrors the loss sustained by the party who is entitled to

11   restitution are cases where money has been paid or there has

12   been some other readily definable benefit.  Indeed that was

13   the case in Dunkin.  Dunkin makes the observation:  "An

14   award limited to unjust enrichment is a relatively

15   mechanical and undemanding calculation."  I think that that

16   statement is true in the vast majority of cases, but it is

17   not true here with respect to the nature of the performance

18   which Don Great rendered.

19           I have also reviewed Ghirardo, G-h-i-r-a-r-d-o, v.

20   Antionioli, 14 Cal. 4th 39 (1996), and Ghirardo in general

21   recites the same principles with regard to restitution and

22   unjust enrichment.  I have also reviewed Dinosaur

23   Development, Inc., v. Lewis H. White, 216 Cal. App. 3d 1310

24   (1989), which is quoted in part in Dunkin.

25           I think all of those cases stand for the

1    propositions which I have recited which govern the equitable

2    analysis.

3                Don Great testified to four years' worth of work

4    which he conferred.  I believe that he in fact conferred a

5    benefit on the MLM library by bringing registrations up to

6    date, by refurbishing tapes, and by reorganizing the tapes.

7                He testified by adopting most of his interrogatory

8    answers in Exhibit 768 that he expended in excess of

9    $2 million.  I do not find that presentation credible.  No

10   invoices were represented for any of the hard costs.  His

11   calendar which supposedly tracked the amount of time

12   expended was not produced.  His testimony to hourly rates

13   was based upon services which outside firms would provide,

14   although he testified I think in one or two instances he may

15   have actually received those hourly rates.

16               But in any event, there was no testimony as to

17   what the net profit would have been with regard to those

18   hourly rates.  I believe that to award unjust enrichment in

19   the approximately $2.3 million figure reflected in Exhibit

20   768 and Mr. Great's testimony would be unreasonable and

21   inequitable.

22               I think it is significant here that the

23   expenditure of time and effort was not a naked expenditure

24   of time and effort.  It was not all of the promised

25   performance.  In addition to engaging in the refurbishment

1   and marketing efforts -- well, in addition to engaging in

2   refurbishing efforts, Mr. Great agreed to take on the

3   obligation to bring home the fruits of those efforts;

4   namely, marketing, selling the material, licensing, and so

5   on.

6        It would be inequitable to give Mr. Great the

7   recoupment for the amounts he expended to put in place the

8   effort of marketing without requiring him to thus market.

9   Having said that, I do not believe that because he was at

10  risk under the agreement of recouping nothing if he did not

11  successfully market that he is entitled to nothing by way of

12  restitution.

13       As I indicated from Dunkin and the other cases,

14  the goal of restitution is to return the parties to the

15  status quo.  If this were day two of the administration

16  agreement, I would simply order all of the materials

17  provided by MLM and Irma Loose to be returned, but we are

18  many years down the line from that, and that cannot be done.

19       I believe that the appropriate measure of

20  compensation for unjust enrichment is a measure of the

21  profits that -- or earnings Mr. Great would have otherwise

22  earned during those years.  He testified that in the ten

23  years prior to the time that he had ceased work on the MLM

24  project that he earned between $50,000 and $75,000 after

25  expenses and after taxes.  I used the higher figure as a

1   benchmark, and I believe that he is entitled for his

2   services to $75,000 per year for four years.

3          However, the recoupment of that amount is

4   contingent upon licensing just as it would have been had the

5   administration agreement continued.  Accordingly, I believe

6   that the equitable result to avoid unjust enrichment is to

7   allow him 20 percent of the royalties obtained by MLM until

8   the $300,000 is recouped.

9          I believe that as a matter of equity Don Great is

10   required to return to MLM all of the materials provided by

11   MLM, all of the refurbished materials including the CDs, and

12   any other work product he generated during the course of the

13   agreement.

14          As part of returning the equitable status quo, I

15   believe that MLM is entitled to have all copyrights returned

16   to MLM.  For each copyright returned, MLM shall be

17   responsible for preparing the necessary documentation for

18   Great to execute, and MLM shall reimburse Great for whatever

19   filing cost was associated with the copyright filing he

20   made.

21          I believe there is credible testimony that those

22   copyright filings avoided waste; that is, clouding of the

23   title of copyright in a way that would make it unusable.  I

24   believe he added value even if the copyrights should not

25   remain in his name.

1          Similarly, I order that for all of the works which

2    Mr. Great registered in the name of Don Great Music and MLM

3    at BMI that upon tender of appropriate paperwork to cause

4    those registrations to be registered exclusively in the name

5    of MLM that Mr. Great shall execute that documentation.

6    Similarly, he shall reimbursed for any filing fee.

7          Again, I find that the cleaning up of the BMI

8    filings added value to the portfolio for which he should not

9    be out of pocket.

10         I find that with respect to the copyright

11   transfers and the BMI transfers that there is no distinction

12   between the works which he restored and the works which he

13   did not restore.  In both cases, the copyrights should be

14   placed simply in the name of -- returned to the name of MLM,

15   and the BMI registrations should be returned to the name of

16   MLM.

17         If upon tender of appropriate documentation and

18   payment of reimbursement Mr. Great refuses to execute the

19   paperwork, MLM may apply to the Court for executing those

20   documents in the name of Don Great Music or Don Great as

21   required.

22         With respect to the Amphonic agreement -- well,

23   let me say with respect to all of the agreements that follow

24   the administration agreement, Exhibits 701 or 1, that they

25   do not necessarily share the taint of being void as Exhibit

1    1 is void.  No direct finding was made by the jury with

2    respect to the EMI, the Amphonic, Sam Fox, or the co-author

3    agreements.  I think that the validity of those agreements

4    needs to be analyzed on their own but nevertheless realizing

5    that part of the context for the original execution of those

6    agreements, namely, the administration agreement, no longer

7    exists.

8            With respect to the Amphonic agreement which

9    appears at Exhibit 712 and 12, Irma Loose is a signatory to

10   the agreement itself as well as to the various schedules.  I

11   believe that the parties should be bound by the rights

12   reflected in the agreement itself.

13           I find informative the cases brought to my

14   attention by Don Great that deal with the parties'

15   responsibilities in signing an agreement.  California

16   generally follows the objective theory of contract.  If one

17   signs a contract, one is presumed to have read the contract

18   and executed it.

19           As pointed out in Marine Storage & Trucking, Inc.,

20   v. Banco Contracting & Engineering, 89 Cal. App. 4th 142, at

21   1049 -- it's 1042 at 1049.  "A party cannot avoid the terms

22   of the contract on the ground that he or she failed to read

23   it before signing it."

24           Similarly, Frame versus Merrill Lynch Pierce

25   Fenner & Smith, Inc., 20 Cal. App. 3d 668 at 671, the Court

1  observes:  "Failure to read a contract before signing it is

2  not in itself a reason to refuse enforcement."

3          On the record before me, I have no reason to

4  believe that Ms. Loose did not have the opportunity to read

5  the Amphonic agreement or was in some manner fooled into

6  signing it.  I believe she is bound by the literal terms and

7  that you take no action on the rights of the parties with

8  respect to that agreement or as set forth in the agreement.

9          With respect to the EMI agreement, 713 or 13 in

10  the plaintiff's numbering, I believe the same result should

11  obtain notwithstanding the fact that Ms. Loose did not sign

12  it.  I make an explicit finding that she is entitled to

13  one-half of the copyright interest along with Don Great

14  Music or if there is a subsequent assignee.  I similarly

15  find that MLM is entitled to one-half interest in the BMI

16  publishing rights and one-half interest in Don Great Music

17  or any subsequent assignee of Don Great.

18          There is testimony that Ms. Loose was aware of the

19  fact that this agreement was being made.  There is testimony

20  by Mr. Great that the agreement was made for the benefit of

21  MLM and Don Great Music.  So I believe that with the

22  modifications which I have indicated the EMI agreement

23  should stand.

24          With regard to the Sam Fox agreement which appears

25  at Exhibit 722 and Exhibit 17, the Sam Fox agreement is

1  actually a number of different agreements all signed by Don

2  Great for and on behalf of Don Great Music and May-Loo

3  Music, Inc.  The agreements themselves in the preamble

4  purport to be between Sam Fox Publishing and Don Great as

5  the exclusive administrator of May-Loo Music.

6          I find significant that although Ms. Loose did not

7  sign the agreement itself that she did sign a separate side

8  letter addressed to Harry Fox in which she acknowledges her

9  review and agreement in the various agreements that

10  constitute the Sam Fox agreement appearing in Exhibit 722

11  and Exhibit 17.  So I believe that this agreement ought to

12  be allowed to stand on its own terms.

13          I believe that there is no evidence that she

14  failed to knowingly sign and execute Exhibit 723 to

15  acknowledge her approval of the agreement.  In Exhibit 723,

16  she in part says:  "I have carefully read over each of the

17  documents listed above and am in complete agreement with

18  each and every term and condition contained therein."

19          I believe that she is bound by the terms of the

20  agreement and the registrations of the copyrights portion

21  that were acquired by Don Great, and the BMI registrations

22  adequately protect her one-half interest in the copyright

23  and the BMI registrations that Don Great obtained.

24          That brings us to the final set of agreements, the

25  so-called co-author agreements, which appear at Exhibits 715

1    through 722, separate agreements with William Castlemen,

2    Emil Cadkin, Jeffrey Castlemen, Sharon Girvin, Paul Ruhland,

3    and Jack Tillar.  For purposes of the present analysis, I

4    lumped Sharon Girvin in, although I acknowledge that the

5    situation is slightly different in terms of what was

6    acquired.

7             First, I note that with regard to -- well, those

8    agreements were between Tinseltown and the co-authors.  As

9    everyone has acknowledged, the co-authors are not before me,

10   and I have no power to adjudicate the validity of the

11   co-authors' interests.  For present purposes, I take the

12   co-authors' interests in those agreements at face value and

13   make no adjudication as to whether those interests are valid

14   vis-a-vis MLM, Irma Loose, Don Great, or any other party.  I

15   simply acknowledge that there is a co-publisher agreement in

16   each instance between Tinseltown and the co-publisher.

17            I am not prepared to find on the present record

18   that there is an alter ego arrangement with respect to these

19   agreements between Don Great and Tinseltown.  I believe that

20   the agreements stand on their face and that they ought to be

21   read in accordance with the facial grant of rights to

22   Tinseltown and to the co-authors.

23            I say that in part because of the manner in which

24   the copyrights have been registered in terms of Tinseltown's

25   interest and the manner in which the BMI rights have been

SHARON SEFFENS, U.S. COURT REPORTER

 1    registered in Tinseltown's interest.  To the extent that the

 2    rights acquired under these agreements are in fact exploited

 3    by Tinseltown, MLM will receive one-half of the royalties.

 4            Now, there has been discussion here as to whether

 5    those rights can in fact be exploited because of the dearth

 6    of music provided by those co-authors.  In the testimony we

 7    had here this afternoon, only two of those co-authors

 8    provided material -- William Castlemen and Sharon Girvin --

 9    and those materials have not been restored, as I recall the

10    testimony.

11            In any event, the other authors, with the possible

12    exception of Tillar, provided no materials.  If Tillar

13    provided anything, it was relatively small.  So I do not

14    believe there is an inequitable circumstance to allow the

15    rights that were required under the co-author agreements to

16    remain as stated in the co-author agreements, particularly

17    when viewed in the light of the copyright registrations and

18    the BMI registrations.

19            I believe that the ruling which I have rendered

20    gives due recognition to the fact that the administration

21    agreement is void and the causes for which it is void.  I

22    believe that the decision I have rendered recognizes that

23    Don Great rendered service for which he should be

24    compensated, and I have determined that's the equivalent of

25    four years which he would earn and did earn during the ten

1    years prior to the termination of the activities on the MLM

2    catalog.   And I believe, as I have said, that that should be

3    contingent upon that catalog in fact producing revenues,

4    just as any income he would have received would have been

5    contingent upon producing revenues as the administrator.

6              As I indicated, any taint that hangs over the

7    administration agreement I do not believe necessarily

8    carries over to the remaining agreements, and I have

9    analyzed those each separately and conclude with the

10   exception of making some explicit rulings with the EMI

11   agreement that each of those agreements on its face is

12   valid -- represents a valid contract that requires no

13   equitable adjustment in light of the facts of this case.

14             So those will be my findings of fact and

15   conclusions of law.   I will request that the court reporter

16   prepare this portion of the transcript, and I will sign this

17   portion of the transcript as my findings of fact and

18   conclusions of law.

19

20   Dated: September 12, 2008

21

22   James V. Selna

23   James V. Selna

24   United States District Judge

25